MEMORANDUM OF DECISION
This memorandum of decision addresses a petition brought to terminate the parental rights (TPR) of Cherie B., the biological mother of Olivia I., who was born on December 1 1997.[2] The Department of Children and Families (DCF) filed the pending TPR petition on January 25, 2001 alleging the grounds of failure to achieve rehabilitation and lack of an ongoing parent-child relationship. DCF originally obtained custody of Olivia through an ex parte Order of Temporary Custody (OTC) entered on April 1, 1998; that order was sustained on April 8, 1998. On November 6, 1998, after hearing, the court found Olivia to be neglected and uncared for, and committed her to the custody of DCF. The child has been maintained in DCF custody since that date. pursuant to orders of the court. For the reasons stated below, the court finds the TPR petition in favor of the petitioner.
Trial of this highly-contested matter took place on June 18 and 19, and August 20 and 21, 2002. The petitioner and the respondent were vigorously represented throughout the proceedings, as was the minor child.[3] The parties submitted a stipulation concerning visitation (Stipulation) on September 20, 2002. All counsel submitted thorough, well-drafted post-trial briefs on or before September 23, 2002.
The Child Protection Session of the Superior Court, Juvenile Matters, has jurisdiction over the pending case. Notice of this proceeding has been provided in accordance with the Practice Book. No action is pending in any other court affecting custody of Olivia.
 I. FACTUAL FINDINGS
CT Page 210
The Court has thoroughly reviewed the multiple other documents submitted in evidence which included the verified petitions, the TPR social study and addendum,[4] psychological reports, resumes, DCF records, a Memorandum of Decision issued by the court on September 21, 2000 and other court records, correspondence. medical records, directions to the foster home. school and rehabilitation service records. The court has utilized the applicable legal standards[5]
 I. A. EVENTS PRIOR TO THE FILING OF THE TPR PETITION OF JANUARY 25, 2001.
Cherie B. was born on January 16, 1979. She was the victim of severe sexual abuse by her father (who was also her mother's stepfather) and by four of her maternal uncles; in 1993, Cherie B's father was murdered by his brother. Cherie B. was in special education classes and did not complete high school. (Exhibits 1, 4.) Often unemployed, she has received nurse's assistant training and has worked in a convalescent home laundry. (Exhibits 1, 5.)
When she was sixteen years old, Cherie B. met Marvin I. Their first child, Marvin I., Jr. (Marvin) was born on December 28, 1995, shortly before the respondent's sixteenth birthday. Olivia was born to Cherie B. and Marvin I. on December 1 1997. Their youngest child, Daisy I., was born on July 28, 1999. (Exhibits 1, 4, 5.) Marvin and Daisy remain in Cherie B.'s care.[8]
Olivia manifested significant medical problems at birth, and required neonatal intensive care for five months. See Part I. C. On March 2, 1998, a referral to DCF was made by the hospital where Olivia was receiving care. Unable to meet the child's severe medical needs, Cherie B. and Olivia's father voluntarily ceded custody to DCF so that she would receive appropriate care and attention. (Exhibit 1.) On April 1, 1998, the day prior to Olivia's discharge from hospital care, the court (Holden, J.) granted an ex parte OTC application; this order was sustained by the court (Holden, J.) after hearing on April 8, 1998.
Olivia was placed in foster care with Judy and Robert V. for provision of specialized medical services. On November 6, 1998, the court (Holden,J.) adjudicated Olivia to be a neglected and uncared for child, and committed her to DCF's custody. (Court Exhibit 4.) To aid in the reunification process, the court provided Cherie B. with specific steps which, among other things, required her to participate in parenting and individual counseling to learn to address and understand the child's special medical needs; accept and cooperate with in-home services; refrain from substance abuse and involvement with the criminal justice system; attend Olivia's medical appointments; and visit with the child "as DCF CT Page 211 permits." (Exhibit 3.)
On June 1, 1999. Cherie B. underwent a court-ordered evaluation by Wendy Underhill. Ph.D., an experienced, licensed psychologist. (Exhibit 6.) This evaluation revealed that Cherie B. "was very limited cognitively as well as psychologically in terms of her personality functions; and that she did not have the necessary resources to adequately parent Olivia with her special needs." (Testimony of Dr. Underhill.) Dr. Underhill recommended that Cherie B. continue to participate in supervised visitation with one and a half year old Olivia but that "the level of her future contact with her daughter be periodically assessed to insure that contact is not upsetting the child and is not harmful for her." (Exhibit 4.)
On October 19. 1999, a TPR petition was filed against Cherie B., alleging failure to achieve rehabilitation.[9] In March 2000, while this petition was pending, DCF agreed to consider enlarging Cherie B.'s opportunities for visiting Olivia, if the respondent complied with certain conditions.[10] (Exhibit 9b.) The first TPR petition proceeded to trial during the summer of 2000. On September 21, 2000 the court (Lopez, J.) terminated Marvin I.'s parental rights based on his consent. The court dismissed the TPR petition against Cherie B. and ordered DCF to make reasonable efforts to reunify mother and child. (Exhibit 12.)
On October 3, 2000, in response to the court's orders, DCF provided Cherie B. with several service referrals, including increased visitation and interactional parenting education through Easter Seals's Preschool Intervention Program (PIP/Easter Seals); visitation with Olivia at the Family Visitation Center (F.C.) with intervention and supervision from FVC staff; and individual counseling at Catholic Family Services or Family Services of Greater Waterbury (FSGW). (Exhibit 9f.) In addition, in early October 2000, DCF again agreed to consider changing the visitation situation if Cherie B. would attend ten visits in a row, attend Olivia's medical appointments, and telephone the agency to confirm scheduled visits. (Exhibits 9e, BB.) On October 11, 2000, the petitioner submitted a Motion for Extension and Review of Permanency Plan, representing that it was appropriate to continue efforts to reunify mother and child, but that TPR and adoption was the best permanency plan applicable in the case. (Court Exhibit 2.) On November 3, 2000 the court (Richards, J.) ruled it was appropriate to continue reunification efforts, but also approved the plan for adoption and ordered DCF to file a new TPR petition against Cherie B. (Court Exhibits 3, 4.)
Cherie B. followed through with DCF's recommendations for additional services, and commenced twice-weekly parenting education sessions with CT Page 212 Olivia at PIP/Easter Seals on October 18, 2000.[11] Although Cherie B. spoke to FSGW in December 2000 regarding individual counseling services; she did not contact the agency for the next four months.[12]
I. B. EVENTS FOLLOWING THE FILING OF THE TPR PETITION JANUARY 25, 2001.
The pending TPR petition was filed on January 25, 2001. In early 2001, Cherie B. completed the requisite PIP/Easter Seals parenting education sessions with Olivia: as she declined to attend further visits at PIP, weekly mother-daughter sessions were scheduled at the DCF office.[13]
(Exhibit 13.) Although she also missed several visits during the summer of 2001 and during the early part of 2002, Cherie B. has otherwise been present at scheduled visits with Olivia, usually accompanied by one of her other children. (Exhibit 7; Stipulation.) Several of these visits have taken place outside of the DCF office, at locations such as a park, a fast-food restaurant, or a shopping mall. (Testimony of Kelly W., Renee T.)
In May 2001, at DCF's referral, Cherie B. again began counseling at FSGW. Her social worker therapist, Lisa A., M.S.W., found the respondent to have Adjustment Disorder with depressed mood.[14] (Exhibits D, E; Testimony of Lisa A.) Initially. Lisa A. encountered difficulty engaging with Cherie B., due to the respondent's distrust of service providers. (Testimony of Lisa A.) FSGW staff initially noted that Cherie B. was "unable to understand DCF's concern" and "may be unrealistic about taking care of [her] daughter."[15] (Exhibit D.) In June 2001, Cherie B. contacted DCF and again requested Marvin's removal from the home due to behavior problems, just as she had approximately one year earlier.[16]
(Exhibit 5.)
On November 9, 2001, Cherie B. underwent a second court-ordered psychological evaluation by Dr. Underhill; interactional evaluations of Olivia with Cherie B. and the child's foster mother were also performed. (Exhibit 5.)
II. C. OLIVIA, THE CHILD.
Olivia was born on December 1 1997 at twenty-seven weeks of gestation, weighing 2 lbs. 3 oz. She was affected by a host of medical conditions that required skilled care, including: loss of oxygen to the brain, seizures, apnea, pneumothorax, respiratory distress syndrome, and gastroesophageal reflux. She also was found to have cerebral palsy, a non-progressive but permanent movement disorder, sickle cell trait and other conditions. (Exhibits 1. 4, 11a, 14, E; Testimony of Dr. M.) On April 1, 1998, when she left the hospital, the child was placed in foster CT Page 213 care with Judy and Robert V., whose home could appropriately address Olivia's acute medical needs.[17]
Olivia's medical conditions improved with time and care. Until the fall of 2001, she required feeding to be administered through a gastrostomy tube that was inserted into her body.[18] (Exhibits 2, 15, F, G, H; Testimony of Kelly W.) Her problems with ambulation were addressed through a series of casts and splints, and physical therapy. Now regarded as having "mild cerebral palsy" Olivia retains a wide-based gait and limited flexion. but is able to independently walk, climb stairs, and engage in other physical activities appropriate to her age. (Exhibits 15, B, F, G; Testimony of Dr. M.) She demonstrates excellent fine motor skills in the classroom. Notwithstanding her present physical stability, Olivia continues to require close scrutiny of her the underlying medical conditions that have affected her digestion, muscle tone, and respiratory function in the past. (Exhibit 11a; Testimony of Dr. M.)
From a psychological perspective Olivia requires long term intervention by way of specialized educational instruction and speech therapy to address her significant delays in language skills; she receives these services at her local public school program, and will require advocacy to retain the level of care she needs.[19] In addition. Olivia is developing indications of hyperactivity, and behavioral difficulties related to stress. (Testimony of Dr. Underhill, Judy V., Diane A.) These conditions require structured, consistent behavior management in the home, and will require therapy when Olivia is older. (Exhibits 11a, B; Testimony of Dr. Underhill.)
 I. D. PLACEMENT EFFORTS FOR OLIVIA
In December of 1999, when Olivia had been in foster care with Judy and Robert V. for two years, DCF registered the child with the Office of Foster and Adoption Services and sought adoption placements outside of the child's current foster home. (Exhibit V; Testimony of Kelly W.) To increase the options for adoption. DCF contracted placement services with a private provider known as the Family and Children's Agency (FCA).[20]
(Exhibits K, L, M.) FCA agreed to work from February 2000 through February 2001 providing adoption related search, placement and finalization procedures for Olivia. (Exhibit N.) In May 2000, having complete its initial assessment of Olivia, her needs and her current placement, FCA recommended that a three-month period be used to attempt to identify a home for Olivia "that is medically savvy and capable of continuing the excellent medical and motivational care that this child has received. The family should have no children or a few older children." (Exhibit P.) Otherwise, FCA concluded that "it would be CT Page 214 unnecessary to move" Olivia from her current foster home. (Exhibit P.)
Upon the dismissal of the first TPR petition in September 2000, FCA acknowledged the ongoing reunification services in which Cherie B. and Olivia were involved. Through January 2001, concurrent with the reunification process, FCA continued to make reasonable, responsible efforts at attempting to recruit appropriate families who might be willing to adopt Olivia and to manage her special needs.[21] (Exhibits 0, Q, R, W.) By February 7, 2001, FCA remained unable to identify any potential adoptive family, other than Judy and Robert V. (Exhibits 0, Q, R.) At that time, FCA recommended that the current foster parents "be considered as the preferred prospective adoptive parents." (Exhibit R.)
In March 2001, in compliance with the court's November 2000 approval of the plan for Olivia to be adopted, DCF proposed that Olivia's current foster home be considered the child's legal risk adoptive placement. (Exhibits T, U.)
 II. ADJUDICATION
In the adjudicatory phase of this hearing,[22] the court has considered the evidence related to circumstances and events prior to January 25, 2001, the date upon which the TPR petition against Cherie B. was filed, insofar as the allegations pertaining to lack of an ongoing parent-child relationship are concerned.[23] Regarding the allegation of Cherie B.'s failure to achieve rehabilitation, the court has also considered the evidence and testimony related to circumstances occurring through the close of trial.[24] Upon review, as discussed below, the court has determined
II. A. LOCATION AND REUNIFICATION EFFORTS
The court finds that the petitioner has met her burden of proving, by clear and convincing evidence, that reasonable efforts[25] were to reunify Cherie B. with Olivia, as is required by General Statutes §17a-112 (j) (1)[26] Based on the circumstances of this case, established through the clear and convincing evidence produced at trial, the court now finds that Cherie B. is either unable or unwilling to benefit from reasonable reunification efforts. § 17a-112 (j) (1).
Carefully considering the evidence in its totality and using an objective measure, it is clearly and convincingly apparent that in this individual case DCF has consistently extended reasonable, appropriate reunification efforts to Cherie B., although the respondent has been unwilling or unable to adequately benefit from the services extended to CT Page 215 her.[27] In re Hector L., supra. 53 Conn. App. 372. When Olivia was very young, the one-on-one parenting and medical management education, provided to Cherie B. by Judy V. and Diane A. at DCF's request, constituted a reasonable effort designed to meet the respondent's need to learn how to care for her child's medical condition. Unfortunately, Cherie B. largely rebuffed these efforts due to her frustration, inability to absorb and utilize information, or general hostility toward those who sought to assist her.[28] (Testimony of Diane A., Judy V.) DCF's referral to the reunification services provided through PIP/Easter Seals parenting education sessions represented. another reasonable effort to respond to Cherie B.'s educational and emotional status, and to address her need to learn to appropriately parent Olivia, especially in the context of her obligations to care for her other children, including Marvin's demands for attention. DCF's re-referral to FSGW's individual counseling services constituted another reasonable effort to improve Cherie B.'s insight into Olivia's condition, and was appropriately designed to enhance the reunification process.[29] (Exhibits 9f, D, E; Testimony of Noalee D.) In addition, although in May 2000 DCF offered to refer Cherie B. to the Parent Aide Program, she demurred explaining that two individuals were already coming into her home on a regular basis to help her with Marvin.[30] (Exhibit 15.)
Furthermore, DCF consistently extended opportunities for contact between mother and daughter, in a reasonable effort at reunification despite Cherie B.'s long history of inconsistent attendance at visits prior to the September 2000 TPR decision. (Testimony of Kelly W., Renee T.) DCF honored Cherie B.'s request to discontinue the use of the foster mother and her staff for transportation to visits, and began utilizing case aides for this purpose, all in a reasonable effort to mollify the respondent, and to reunify the family. (Testimony of Judy V., Diane A.) By early winter 2001, Cherie B. had completed fifteen PIP/Easter Seals parenting education sessions with Olivia over the course of approximately three months, yet she had failed to achieve measurable improvement in her ability to serve the child's needs.[31] As found in Part I. B., when Cherie B. declined the opportunity to participate in supervised visits at the PIP/Easter Seals program, weekly visits were made available at the DCF office. As found in Part II. A., DCF reasonably determined that Cherie B.'s lack of progress with the PIP/Easter Seals program and her inability to retain the information she had been taught there rendered home visits inappropriate, so that the respondent's apartment, where Marvin and Daisy also reside, was not designated an available site for with Olivia. (Testimony of Noalee D.) Cherie B. contends that because DCF never provided her with the opportunity to visit with Olivia at her home, she was deprived of a meaningful prospect for using that setting to develop a bond with Olivia.[32] Notwithstanding the vigor of this CT Page 216 claim, the court finds that the visitation opportunities provided by DCF were reasonable in nature, given the respondent's persistent failure to retain or demonstrate her ability to appropriately use the parenting skills and information that had been taught to her.[33]
In addition, Cherie B. has intermittently, but vigorously, given signs of her own lack of commitment to the reunification process and her lack of motivation for reunification with Olivia. For instance, although additional interactional services with Olivia were made available to her, in an effort to enhance her child care skills, Cherie B. advised the staff that she was "not interested in returning to PIP [/Easter Seals] for another parenting session." (Exhibit 13.) As fully discussed in Part II. B., from 2000 through 2002, even after she had participated in individual counseling, Cherie B. wrote DCF a series of letters clearly expressing her desire to limit or eliminate visits with the child. See Part II. B. These factors all establish Cherie B.'s unwillingness or inability to respond to specifically directed parenting training, and indicate her lack of capacity to function effectively as a caretaker of multiple children in the community at large, and demonstrate her inability or unwillingness to benefit from reasonable reunification services.
Cherie B.'s limited ability or willingness to benefit from reunification services is further apparent upon review of the individual counseling sessions which commenced at FSGW in May 2001. Cherie B.'s therapy has focused upon efforts to address her continuing frustration with and anger at DCF; educating her about the challenges of treating a child with Cerebral Palsy and other medical conditions like Olivia's;[34]
and her concerns about her son Marvin "who has tantrums and hits himself" (Exhibit D.) Assistance with "anger mgmt issues" was also offered to Cherie B. (Exhibit D.) However, any progress that Cherie B. has made in therapy has not provided a timely benefit with regard to her ability to effectively participate in reunification services. As found in Part I. A., Cherie B. took a prolonged period of time to develop the ability to trust or effectively interact with her therapist; and treatment sessions largely focused on using the computer to research Olivia's medical conditions.[35] (Exhibit D; Testimony of Lisa A.) Cherie B.'s cooperation with therapy may have improved somewhat over this period, despite the slow rate of her progress and her persistently inflexible attitude toward cooperation with service providers. Overall, however, the clear and convincing evidence in this matter impels the conclusion that to date, despite continued therapy with Lisa A., Cherie B. has not yet demonstrated a willingness or ability to make timely use of individual therapy, leaving her largely devoid of the communication skills which are fundamental to good parenting, and lacking even the ability to draw a CT Page 217 real benefit from clinically supervised parent-child interactions.[36]
From time to time, Cherie B. has had a discordant relationship with DCF, and she would have the court find that the reunification process was compromised by the child protection agency's inappropriate attitude toward her.[37] However, the evidence clearly and convincingly reveals that the family's assigned social workers have treated the respondent with dignity and respect. (Testimony of Kelly W.) Cherie B. has been distressed by what she perceives as the DCF's offers of reunification plans, which she believes have unreasonably been withdrawn without implementation; this has caused her to have feelings of hostility toward DCF, as Cherie B. was unable or unwilling to accept DCF's reasonable reliance upon the results of the PIP/Easter Seals program, which indicated that she was not ready for the nature or extent of visitation requested by the respondent.[38] (Testimony of Dr. Underhill.) Cherie B. may also argue that DCF and Olivia's foster mother made it difficult or impossible for her to attend the child's medical visits. The evidence clearly and convincingly establishes, however, that Olivia's general physician alone made the reasonable decision that Cherie B.'s disruptive behavior at appointments was adverse to the child's best interests, and therefore warranted the respondent's exclusion from these appointments. (Testimony of Judy V.)
Cherie B. protests that DCF cannot be found to have extended reasonable efforts at reunification because the agency did not immediately respond to her request in July 2001 that visits with Olivia take place at FSGW. Notwithstanding the respondent's complaint, clear and convincing evidence reveals that it was reasonable for DCF to delay in modifying the visitation as requested. The evidence clearly and convincingly establishes that it would have been premature for Olivia to have entered into therapeutic visitation with Cherie B. during the summer of 2001, as the respondent mother had recently demonstrated her inability or unwillingness to benefit from the PIP/Easter Seals interactional program; she had just commenced her own counseling process; and there was insufficient basis upon which it could be reasonably concluded that the respondent had already obtained any measurable benefit from clinical intervention.[39] In addition, the evidence clearly and convincingly reflects that DCF reasonably demurred from scheduling visits at FSGW until the respondent's preferred agency could schedule mother-daughter sessions at a time which did not conflict with Olivia's public school sessions, and during which DCF also had transportation available.[40]
(Testimony of Kelly W.) In making these determinations, DCF acted reasonably, in the best interest of the child, who was well-served by consistent attendance at school and by the provision of DCF's transportation services. CT Page 218
Cherie B. further maintains that DCF cannot be found to have extended reasonable efforts at reunification because she and her child have been unfairly treated by DCF.[41] She argues that her reunification with Olivia was disrupted due to the child's placement with Judy and Robert V., which she sees as harmful in nature. Cherie B. has a rancorous relationship with Judy V., whom she feels is abusing the adoption process.[42] (Exhibits 8a, 8d.) Despite Cherie B.'s assertions, the evidence clearly and convincingly reveals that during the child's first years of life, Judy V. and other health care workers at her home made appropriate albeit unsuccessful efforts to involve Cherie B. in the process of learning to care for Olivia's many medical needs, anticipating the respondent's role as a primary caretaker.[43] Taken as a whole, the evidence is altogether insufficient to substantiate Cherie B.'s claims that any conduct on the part of Judy or Robert V. in any way interfered with the reunification process, or with the maintenance of a mother-daughter bond.
Cherie B. has long protested that if Olivia must remain in foster care, she should not be living with Judy V. (Exhibit F.) However, the evidence clearly and convincingly establishes that Olivia is well cared for in her current placement. With Judy and Robert V., Olivia is surrounded by a loving, nurturing, and structured environment which long suited her special medical needs, and now meets her special psychological needs as well. (Testimony of Kelly W., Judy V.) There is insufficient evidence from which this court could conclude that removing Olivia from the home of Judy V. would have so enhanced the reunification process that it would outweigh the severe detriment that would have been caused to the child through such action.[44]
Cherie B. may argue that DCF failed to undertake reasonable efforts at reunification. under the analysis utilized in In re Vincent B.,73 Conn. App. 637, ___ A.2d ___ (2002). Salient factual distinctions, however, render the Vincent B. result inapposite to the present matter.[45]
Fundamentally, in Vincent B., the Appellate Court found that "the department had made no efforts at reunification at all" when it could and should have promoted the reunion of the father and child at issue. DCF was found to have made a calculated decision "not to engage in further efforts to reunify [the child at issue] with the respondent . . . based on its prior experiences with the respondent [which] predated the respondent's participation in the treatment program."Id., 643. The Appellate Court identified "a window of opportunity during which reasonable efforts at reunification should have been made . . . after the CT Page 219 respondent's completion of the treatment program." Id., 644-645. In the present case, DCF met the Vincent B. test of making reasonable efforts to reunite Cherie B. and Olivia following the issuance of the TPR decision in September 2000. DCF recognized its "window of opportunity" even while honoring the court's November 2000 order to file a new TPR petition against Cherie B. (Court Exhibits 3, 4.) DCF continued its reasonable reunification efforts by promoting the one-on-one parenting education program sponsored by PIP/Easter Seals and by referring Cherie B. for individual counseling at FSGW, in addition to scheduling regular mother-daughter visitation.
Under the totality of the circumstances, it is clearly and convincingly apparent that although DCF extended appropriate reunification efforts to the respondent, those efforts were largely thwarted by Cherie B.'s own conduct, choices, and inability or unwillingness to benefit, in a timely manner, from the reasonable services tendered to her.[46] Here, reunification efforts were rendered unsuccessful due to "the respondent's behavior, not the conduct of the department" in depriving her of visits with Olivia on FSGW premises, or otherwise. In re Amelia W.,62 Conn. App. 500, 506, 772 A.2d 619 (2001). See also In re Ebony H.,68 Conn. App. 342, 350. 789 A.2d 1158 (2002).
 II. B. STATUTORY GROUNDS FOR TERMINATION — FAILURE TO REHABILITATE- § 17a-112 (j) (3) (B)
The petitioner first alleges that Cherie B.'s parental rights should be terminated because she has failed to achieve rehabilitation within the meaning of § 17a-112 (j) (3) (B).[47] Cherie B. counters that she has attended to the pivotal elements of the specific steps, and has made sufficient progress in rehabilitation to resume a responsible role in Olivia's life. As Olivia was found to be uncared for on November 16, 1998, the critical issue for this court is whether the respondent has achieved statutory rehabilitation. Applying the requisite legal standards,[48] and construing the statute in accordance with §17a-112 (p), the court finds this issue in favor of the petitioner.
Several aspects of the clear and convincing evidence in this case compel the conclusion that Cherie B. has yet to achieve a sufficient degree of rehabilitation with regard to Olivia's care and needs as would encourage the belief that at some reasonable date in the future the respondent could assume a responsible position in Olivia's life.[49]
See In re Daniel C., 63 Conn. App. 339, 354, 776 A.2d 487 (2001); In reAshley S., supra, 61 Conn. App. 665; In re Sarah Ann K, supra,57 Conn. App. 448. First, the psychological evidence in this case clearly and convincingly establishes that Cherie B. has not achieved § 17a-112
CT Page 220 (j) (3) (B) rehabilitation in that she has not "gained the ability to care for the particular needs of the child at issue."[50] In re Sarah AnnK., supra, 57 Conn. App. 448. Despite Cherie B.'s vigorous argument to the contrary, the court finds that Dr. Underhill, the court-appointed psychological evaluator, has long, valid experience and expertise in assessing a parent's ability to achieve rehabilitation. Dr. Underhill evaluated Cherie B.'s psychological status through written testing and personal interviews, thoroughly measuring a broad spectrum of the respondent's areas of competency and function. The court fully credits Dr. Underhill's resulting, reliable and objective opinions which establish among other things that Cherie B. suffers from impaired short-term memory, and that she "has a full scale IQ of 62, which would place her in the mild mental retardation range of intelligence." (Exhibits 4, 5: Testimony of Dr. Underhill.) Cherie B.'s personality characteristics indicate considerable immaturity, strong dependency on others, and a "tendency to think in the naive and impressionistic manner . . . [to] see things as she would like to see them and not incorporate actual facts that would allow her to see them in a more realistic fashion."[51] (Exhibits 4, 5; Testimony of Dr. Underhill.) When Dr. Underhill reassessed Cherie B. and conducted an interactional evaluation with Olivia in November 2001, Cherie B. had participated in several months of parenting classes at PIP/Easter Seals and had attended individual counseling with Lisa A. since May 2001. Based on her observations and evaluations, insofar as Cherie B.'s parenting capacity was concerned, Dr. Underhill credibly opined in November 2001 that the respondent still "did not have the cognitive level of functioning, level of understanding, or psychological resources to effectively parent Olivia."[52] (Testimony of Dr. Underhill.) The court credits Dr. Underhill's opinion that from a psychological standpoint, although Cherie B. knows when to ask for help, despite the services rendered the respondent has not yet developed the ability to adequately care for three children, especially given Marvin's obvious behavioral difficulties, and Olivia's developing hyperactivity. (Exhibit 5, Testimony of Dr. Underhill.) Notwithstanding the counseling she has received from Lisa A., Cherie B. remains unable or unwilling to understand or to adequately respond to Olivia's continuing need for medical surveillance or her nascent behavioral and emotional issues, so that she could not responsibly care for this child even as a singleton. See In re JonathonG., supra, 63 Conn. App. 526. In view of the totality of the evidence establishing Cherie B.'s unwillingness or inability to recognize her need for continued services to address her own parenting or mental health needs; her limited coping skills; her tendency to deny problems; and her short-term memory impairment; the court is constrained to conclude, as Dr. Underhill wrote following her November 2001 evaluation, that "the mother does not have the necessary resources to meet Olivia's complex CT Page 221 needs now or in the future."
(Exhibit 5; Testimony of Dr. Underhill.)
Second, as found in Part II. A., the empirical evidence reflects Cherie B.'s unresolved limitations in her ability to absorb and retain the information and skills necessary for effectively parenting Olivia. The respondent's short-term memory impairment, identified by Dr. Underhill in her psychological assessment, manifested itself in her inability to retain the individualized instruction provided for care of Olivia when she was still receiving acute care at her foster home; despite the skilled instruction and support provided by Diane A., Cherie B. was unable to apply the techniques she had been taught from visit to visit; she could not fully understand the medications that were administered to the child; and she overall remained unable or unwilling to provide Olivia with the skilled care she needed despite one-on-one care and attention. When visits were moved from the foster home to DCF's office, at Cherie B.'s request, Diane A. continued to provide training in managing Olivia's specialized needs, until the respondent's unprovoked hostility toward the child care assistant led to disruption and then discontinuation of this valuable parent-education process. (Exhibit 1; Testimony of Diane A., Kelly W., Judy V.)
When Cherie's lack of progress at the PIP/Easter Seals program is examined, once again it is apparent that her short-term memory impairment restricts her ability to retain and apply the parenting skills she has been taught. (Testimony of Kelly W., Dr. Underhill.) The PIP/Easter Seals staff provided role modeling for mother and daughter on a one-on-one basis, guiding them through a series of supervised activities, and providing Cherie B. with homework and reading materials. (Testimony of Kelly W.) However, as found in Part II. A., Cherie B. was unable to effectively utilize the instruction in parenting skills that was provided, and she was not adequately able to either engage Olivia on her own, or to provide responsible supervision for Olivia and her sister Daisy when they were together. (Exhibit 13.)
Even long-term therapy with Lisa A. has failed to yield measurable improvement in Cherie B.'s ability to serve as an effective parent for Olivia, especially when her other two children are factored in. As found in Part II. B., although she received therapy at FSGW in 1998-1999, and despite long-term therapy with Lisa A., Cherie B. still lacks the skills necessary to appropriately respond to, manage and direct her children's behavior. During recent visits, Cherie B. often attends to her other children's rambunctious, aggressive behavior, so that, little effective parent-child communication takes place during visits with Olivia. CT Page 222 (Testimony of Carl H.) While Cherie B. may attribute the lack of mother-daughter interaction to the location in which visits are held. her present limited ability to appropriately interact with Olivia nearly mirrors her experience at PIP/Easter Seals where, in the winter of 2001, she had similar difficulties in focusing on Olivia, while Daisy was also making demands upon her.
Third, although specific steps were assigned to assist Cherie B. in achieving rehabilitation, the evidence clearly and convincingly indicates that she failed to fulfill a number of significant measures. As described in Part I. A., the steps specifically directed Cherie B. to visit with the child "as DCF permits." (Exhibit 3.) Historically, Cherie B. has initiated long periods when visitation was suspended at her own request, impeding her own rehabilitation process and limiting her ability to maintain a relationship with her child.[53] Commencing in June 2000, Cherie B. wrote a series of letters to DCF expressing her position regarding the reunification process and indicating her intention to limit or eliminate visits with Olivia.[54] In June 2000, Cherie B. sent the agency two letters indicating that she did not want to continue with the reunification process.[55] In response, DCF discontinued scheduling visits, but advised Cherie B. that she should contact the agency if she wished to renew visits. (Exhibit 9d.)
Months later, in February 2001, Cherie B. again wrote to DCF indicating that she no longer wanted to hear from the agency, and stating that she would not visit Olivia at the DCF offices if the child was transported by Diane A., but indicating her desire to continue visits at PIP/Easter Seals or her home.[56] (Exhibit 8b.) When Cherie B. ended her PIP/Easter Seals sessions in early 2001, DCF reasonably determined that home visits would be inappropriate, based on the provider's report that the respondent "had difficulty in taking what you learned in the classroom and using it to work with Olivia" as well as her reported inability to keep track of her three children at once, or to react with them in a positive manner when she was charged with their care, even in a supervised setting. (Exhibit S.) DCF wrote to Cherie B. in a reasonable effort to quell the respondent's apparent consternation with the reunification process; the agency advised her of the decision to continue visits only at the DCF office and to explain the basis for that decision. (Exhibit S.)
Cherie B. responded in March 2001, indicating to DCF that she would only participate in visits if the child came to her home.[57] (Exhibit 8a.) As found in Part I. B., DCF reasonably agreed to consider home visits if Cherie B., among other things, consistently visited with the child at DCF and telephoned in advance if she was unable to attend a CT Page 223 planned mother-daughter contact. (Exhibit 9b.) However, on January 5, 2002, after many months of counseling with Lisa A., the respondent again wrote to DCF asking the agency to refrain from calling her. "I will not see Olivia anymore . . . I will not attend counseling nor parenting classes. I want to be left alone don't bother to phone me . . . I will not show up for court too." (Exhibit 8e.) Visits were suspended for approximately two months. (Testimony of Carl H.)
Although visits were thereafter reinstituted, the quality of mother-daughter interaction is quite poor, with little communication or personal contact, frequent indications of boredom and fatigue, and inadequate parental response to Olivia's cues. (Testimony of Carl H., Noalee D.)
While Cherie B. may highlight the fact that she has improved the frequency of her attendance at visits, the sessions are not sufficiently productive to serve as a valid indicator of the respondent's ability to develop or maintain a stable parent-child relationship. In re MichaelL., 56 Conn. App. 688, 694. 745 A.2d 847 (2000). Rather, as found in Part II. A., although Cherie B. was present at visits, the quality of mother-child interaction was limited or non-existent, as the respondent spent most of her time attending to her other children or evincing her disinterest, instead of paying attention to Olivia. Such visitation may illustrate a parent's improved ability to manage her own time and adhere to externally imposed schedules, but they are "decidedly one-sided in favor of [the respondent]." In re Amy H., 56 Conn. App. 55, 60,742 A.2d 372 (1999). Cherie B.'s conduct during visits does not in any other respect establish her ability or willingness to provide safe, nurturing care for a child, such as Olivia. who has present special educational needs and incipient psychological, behavioral and learning-related issues requiring close attention. (Testimony of Dr. Underhill, Judy V., Diane A.)
Based on all the facts presented in this case, the court finds by clear and convincing evidence that Cherie B.'s rehabilitation is not foreseeable within a reasonable time. In re Daniel C., supra,63 Conn. App. 353. The court fully credits Dr. Underhill's well-founded opinion that despite the time that has passed since the first TPR decision, and despite her involvement in appropriate parenting and counseling programs, Cherie B. has made little progress in developing the ability to parent Olivia, and this condition is not likely to improve in any significant manner within any period reasonably contemplated by § 17a-112 (j) (3) (B). (Testimony of Dr. Underhill.) In reaching its conclusion, the court has analyzed the limited degree of progress Cherie B. has made during her long-term therapy with Lisa B., and assessed the CT Page 224 respondent's relative lack of present rehabilitation as it relates to Olivia's particular needs for a responsible parent who can provide her with emotional stability, security, and consistency. Even if Cherie B. should now actively engage in rehabilitation, her efforts would be "too little and too late" for Olivia given the four years that have passed since her adjudication as a neglected and uncared for child. In re SheilaJ., 62 Conn. App. 470, 481-82, 771 A.2d 244 (2001).
Thus, in its totality, the clear and convincing evidence compels the conclusion that despite some participation in a rehabilitation regimen, Cherie B. remains without the qualities necessary to successfully parent Olivia; she also lacks the ability to assume a responsible position in the child's life within a reasonably foreseeable time in the future. Accordingly, based on the clear and convincing evidence presented in this case, the court finds that the petitioner has proved the respondent's failure to achieve rehabilitation pursuant to § 17a-112 (j) (3) (B).
 II. C. STATUTORY GROUNDS FOR TERMINATION — LACK OF ONGOING PARENT-CHILD RELATIONSHIP — § 17a-112 (j) (3) (D)
The petitioner next alleges that no ongoing parent-child relationship exists between Cherie B. and Olivia, and that the child's best interests will not be served by allowing additional time for this relationship to be developed, so that the TPR petition should be granted pursuant to General Statutes § 17a-112 (j) (3) (D).[58] Cherie B. argues DCF cannot prevail on this ground because she has visited with Olivia on a fairly consistent basis during the past year and because she loves her child. Applying the requisite legal standards, and construing the statute in accordance with § 17a-112 (p), the court finds this matter in favor of the petitioner.
The relevant legal algorithm first requires the court to determine whether a parent-child relationship exists between Cherie B. and Olivia.[59] In re Jonathon G., supra, 63 Conn. App. 525. In this case, the evidence reflects no such relationship, as the respondent has never met her daughter's emotional, moral and educational needs, criteria specified in § 17a-112 (j) (3) (D).[60] She did not do so prior to January 25, 2001 when the pending TPR petition was filed; then as now she has lacked the ability to meet these needs and is further unable to appropriately supervise Olivia in a physical sense when her other children are present, despite the extension of reasonable and appropriate efforts directed at enhancing her capacity to do so. See Parts II. A. and B.
Overall, the evidence impels the determination that although Cherie B. sincerely affirms her love for Olivia, she has never promoted, developed CT Page 225 or maintained a parental relationship with this child. She did not do so prior to January 25, 2001; then as now the respondent has chronically failed to effectively interact with her daughter on a personal level, intrinsic to the parent-child relationship at issue. This failure is manifest in the clear and convincing evidence of absence of effective parental-type interaction between the respondent and her daughter during visitation sessions from October 2000 through early 2001 at the PIP/Easter Seals program., prior to submission of the pending TPR petition. See Parts I. A., II. A. and II. B. Except when outdoor activities were involved, Cherie B. initiated, allowed or permitted only limited opportunities for interaction with Olivia during these sessions, focusing instead on other matters. As a result, the child developed no discernable attachment to the respondent notwithstanding their time together and the availability of on-site parent education.[61] (Exhibit 13.) Similarly, during her ensuing visits at DCF, Cherie B. lacked a sufficient degree of parental concern for or interest in Olivia; she sometimes played appropriately with her, but often failed to engage the child in communication or contact, and did not consistently respond to the child's entreaties for attention. Instead, Cherie B. frequently merely sat and watched Olivia, stared into space, or attended to the other children whom she had brought along to the visits. These behaviors, present both before and after January 25, 2001, are inconsistent with either the loving tenderness and attention commonly associated with a parent's affectionate feelings for her child, or an ongoing parent-child relationship contemplated by the statute. (Testimony of Kelly W., Carl H.)
In discerning whether a parent-child relationship exists, the court must also determine whether Olivia maintains any feelings for Cherie B. at present and. if so, whether those feelings are of a positive nature.In re Jonathon G., supra, 63 Conn. App. 525.[62] The evaluation conducted by Dr. Underhill in November 2001 reliably revealed that as the child has matured, she has not developed any meaningful recognition of, emotional connection to, or desire to be with Cherie B.[63] (Exhibit 5) The credible testimony related to Cherie B.'s more recent visits with Olivia clearly and convincingly establishes that although the child is sometimes somewhat willing to meet with her mother, the visits remain unsuccessful and are often chaotic in nature. the respondent fails to respond to the child's efforts at communicating with her, leaving Olivia to play by herself without parent-child interaction; instead, Cherie B. stares into space, holds her head in her hands, or attends to Daisy or Marvin who attend many visits. Neither mother nor daughter appears to enjoy the visitation sessions. (Testimony of Carl H.) The evidence clearly and convincingly revealed that any feelings that Olivia may retain for Cherie B. are more akin to the emotional ties a child may have CT Page 226 with a kind distant relative or acquaintance, but not those which are ordinarily developed with a parent, within the meaning of § 17a-112
(j) (3) (D).[64] In re Jonathan G., supra, 63 Conn. App. 524-25.
As it is thus apparent that no statutory parent-child relationship exists between mother and daughter in this case, and that no such relationship was extant as of the date when the pending TPR petition was filed, the court is next called upon to assess whether it would be detrimental to the child's best interests to allow additional time for a parenting relationship to be developed with Cherie B. In re Jonathon G.,
supra, 63 Conn. App. 525. Although Olivia has made great strides in overcoming her physical limitations, she remains a child with "multiple, not only physical, but psychological problems" which are manifest in her hyperactivity and which will require therapeutic attention, as Dr. Underhill has cogently explained. (Testimony of Dr. Underhill.) See Part I. C. As found in Part II. B., the credible, reliable psychological and experiential evidence in this case leads to the conclusion Cherie B.'s personal circumstances and capacity to parent are not going to change or improve in any significant manner over the next few years.[65] In addition. as fully discussed in Part III. B., it is patently obvious that in the months following the issuance of the first TPR decision, Olivia has been firmly bonded to her foster mother, such that removing the child from her present environment would have a significant, deleterious effect upon her. Under these circumstances, as Dr. Underhill has cogently opined and as Olivia's counsel has argued, it would be detrimental to the child if she were required to wait any longer for her mother to be sufficiently able to provide her with appropriate care. (Exhibit 5; Testimony of Dr. Underhill.) Given the totality of the circumstances in this particular case, the court concludes that Olivia's best interests will best be served by termination of parental rights and adoption, not by reunification with her biological mother. See Pamela B. v. Ment, supra,244 Conn. 314. 296, 314, 709 A.2d 1089 (1998) (child's physical and emotional well-being must be weighed against the interest in preserving family integrity).
Cherie B. protests that her lack of an on-going relationship with Olivia was caused by her long commitment to DCF, the agency's provision of inadequate services, and the limited options available for resolution of her problems. Such argument must be rejected in this case, as in In reShane P., 58 Conn. App. 244, 256, 754 A.2d 169 (2000). "Here, the respondent's behavior, not the conduct of the department, prevented the development of a relationship with [her daughter]." In re Amelia W.,
supra, 62 Conn. App. 506. See also In re Deana E., supra.61 Conn. App. 193. In the present case, as found in Part I. A., Cherie B. voluntarily ceded care of her special needs infant to DCF. She has CT Page 227 been offered multiple appropriate rehabilitation services as part of the agency's reasonable efforts to help her develop a meaningful relationship with her daughter. as found in Parts I. and II. Instead of fully utilizing these services, and learning appropriate methods for managing the multiple children for whom she desired to provide care. Cherie B. remained subject to the sway of her own anger and frustration, expressing her impatience with the reunification process by defiantly stating her intention to refuse DCF services or assistance, or voluntarily suspending visitation with her daughter for months at a time. Thus, as in Shane P.,
the result of the respondent's conduct is that this child has no present feelings for or memories of her in a maternal role, so that Olivia views her foster mother as her parent. In re Shane P., supra, 58 Conn. App. 241.
Cherie B. has argued that she is protected from claims brought pursuant to § 17a-112 (j) (3) (D) through the principles of law set forth in Inre Valerie D., 223 Conn. 492, 499, 613 A.2d 748 (1992).[66] ReadingValerie D. too broadly, Cherie B. apparently asserts that any placement of a [child] with DCF . . . fatally interferes with the development of an ongoing parent-child relationship, and thus eliminates the petitioner's opportunity for subsequent reliance upon [§ 17a-112 (1) (3) (D)]." In reAntwoine D., Superior Court for Juvenile Matters, Child Protection Session (N. Rubinow, J.; April 2, 2001.) However sincere, the respondent's reliance upon Valerie D. is misplaced in this case, as "[t]he lessons of [that case] are more limited in scope . . . and provide no succor for [Cherie B.]. Valerie D., supra, presents multiple, compelling factual circumstances supporting the conclusion that DCF's early intervention in that child's life had, in and of itself, served as the death knell for that respondent's efforts to develop a parenting relationship with her child. Those circumstances are absent in the present case. . . ." In re Aniwoine D., supra. Here, it was Cherie B's voluntary placement of her child in a DCF sponsored foster home, followed by her own inattentiveness and unwillingness or inability to learn how to care for and respond to the child's needs which clearly and convincingly "served to cause, allow and permit the lack of a parent-child relationship to be established with [Olivia]." In re Antwoine D., supra.
"It is reasonable to read the language of no ongoing parent-child relationship to contemplate a situation in which, regardless of fault, a child either has never known his or her parents. so that no relationship has ever developed between them, or has definitively lost that relationship, so that despite its former existence it has now been completely displaced." (Citations omitted.) In re John G.,56 Conn. App. 12, 22, 740 A.2d 496 (1999). Such construction is applicable to the present case, where the clear and convincing evidence establishes that any valid parenting relationship that Cherie B. may have CT Page 228 developed with Olivia has been definitively lost due to the respondent's failure, unwillingness or inability to cooperate with the process of learning to care for the child's acute medical care needs when she was an infant; to acquire and apply appropriate parenting skills; or even to pay a reasonable amount of attention to this daughter. Whether the adjudicatory date of January 25, 2001 or the relevant present factual status is used as a measure, the clear and convincing evidence in this case establishes that no ongoing parent-child relationship exists between the respondent and her daughter, and that it is not in the best interests of Olivia to allow more time for her to develop a relationship with her biological mother. Thus, the petitioner has met her burden of proof under § 17a-112 (j) (3) (D). In re Jonathon G., supra. 63 Conn. App. 525; Inre John G., supra, 56 Conn. App. 22.
 III. DISPOSITION
As the court has concluded that statutory grounds for termination exist, it next "must determine whether termination is in the best interests of the child." (Citation and quotation marks omitted.) In reQuanitra M., supra, 60 Conn. App. 103; see also In re Valerie D., supra,223 Conn. 511 and n 15. In this dispositional phase the court has considered the evidence and testimony related to circumstances and events through the close of evidence. Practice Book 33-5.
III. A. SEVEN STATUTORY FINDINGS
In deciding whether to terminate parental rights, the court has made and considered written findings regarding the seven factors delineated in § 17a-112 (k), based on the clear and convincing evidence presented at trial.[67] In re Clark K., 70 Conn. App. 665, 667, 299 A.2d 1099
(2002); In re Quanitra M., supra, 60 Conn. App. 104-105.
III. A. 1. TIMELINESS, NATURE AND EXTENT OF SERVICES — §17a-112 (k) (1)
In Part II. B., the court concluded by clear and convincing evidence that Cherie B. is unable or unwilling to benefit from reasonable efforts at reunification with Olivia. Prior to trial, but following the issuance of the first TPR, timely and appropriate services were provided for Cherie B. as described in Parts I. and II., including: supervised interactional parenting education through Easter Seals's Preschool Intervention Program (PIP/Easter Seals); visitation with Olivia at the Family Visitation Center (FVC) supervised by FVC staff; individual counseling at Catholic Family Services or Family Services of Greater Waterbury (FSGW). Services prior to the issuance of the first TPR are CT Page 229 fully set forth in Exhibit 1, including but not limited to one-on-one parenting and medical management education, visitation at the foster home and DCF, transportation using DCF aides in lieu of the foster home personnel, and case management services. See Part II. A.
III. A. 2. REUNIFICATION EFFORTS PURSUANT TO FEDERAL LAW — §17a-112 (k) (2)
DCF made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended, as described in Parts II. A. and III. A. 1. Furthermore, in Part II. B., the court has concluded by clear and convincing evidence that Cherie B. is unable or unwilling to benefit from reasonable efforts at reunification with Olivia.
III. A. 3. COMPLIANCE WITH COURT ORDERS — § 17a-112 (k) (3)
As found in Part I. A., specific steps were imposed on Cherie B. in November 1998. Although these steps required the respondent to keep her own whereabouts known to DCF, Cherie B. failed to advise the agency of a change in her telephone number. (Exhibit 9e.) She has maintained adequate housing for her children and has held employment at nursing home facilities. (Exhibits E, 15.) During 2000, Cherie B. missed visitations with Olivia due to nurse's aid training and a vacation she took in August. (Exhibit 5.) Except for a self-imposed period of suspension in early 2001. Cherie B. has regularly visited with Olivia since the first TPR decision, although she inconsistently attended visits prior to that event.
III. A. 4. CHILD'S FEELINGS AND EMOTIONAL TIES — § 17a-112(k) (4)
The evidence overwhelmingly establish that Olivia is not bonded to the respondent. (Testimony of Dr. Underhill, Carl H.) Although Judy V. has provided primary care for Olivia. the child views both Judy and Robert V. as the parents to whom she is most bonded and attached. She sees them as consistent figures in her life who provide her with a sense of safety and security, and views Judy V. as her "mother."[68] (Testimony of Dr. Underhill; Exhibit 5.) Olivia's GAL reported that the child has closer emotional ties to the other children in her foster home, than she does to her biological siblings Marvin and Daisy, and no other evidence contradicts this report.
III. A. 5. AGE OF THE CHILD — § 17a-112 (k) (5)
CT Page 230
Olivia was born on December 3 1997, and is five years old.
III. A. 6. PARENT'S EFFORTS TO ADJUST HER CIRCUMSTANCES — §17a-112 (k) (6)
Cherie B. has not maintained adequate contact with DCF regarding the status of her child; although she has visited, she has not adequately sought information related to Olivia's health or development. She has not made realistic and sustained efforts to conform her conduct to even minimally acceptable parental standards. As found in Part II., giving her additional time would not likely bring her performance, as a parent, within acceptable standards sufficient to make it in the best interests of the child to be reunited with her.
 III. A. 7. EXTENT TO WHICH THE PARENT WAS PREVENTED FROM MAINTAINING A RELATIONSHIP WITH THE CHILD — § 17a-112 (k) (7)
No unreasonable conduct by the child protection agency, foster parents or third parties prevented Cherie B. from maintaining a relationship with the child at issue in this case, although the limitations and restrictions inherent in the foster care system were in effect. (Testimony of Carl H., Kelly W., Judy V.) The economic circumstances of the parent did not prevent such a relationship; although DCF offered to provide transportation to visits. Cherie B. usually obtained her own transportation, and she has the ability to work. (Exhibits 1, 5; Testimony of Renee T., Kelly W.) Cherie B.'s claims that DCF and the foster parents unreasonably interfered with her maintenance of a relationship with Olivia remain unsupported by the evidence, as fully discussed in Part II. A. of this opinion.
III. B. BEST INTERESTS OF THE CHILD — § 17a-112 (j) (2)
The court is next called upon to determine whether termination of Cherie B.'s parental rights would be in Olivia's best interests.[69]
Applying the appropriate legal standards[70] to the facts which are clearly and convincingly apparent in this case, and incorporating the best interests analysis set forth in Part II. C., the court finds this issue in favor of the petitioner.
In determining whether termination of the respondent's parental rights would serve her daughter's best interests, the court has examined the multiple relevant factors, including the child's interests in sustained growth, development, well-being, stability and continuity of her environment; her length of stay in foster care; the nature of her relationship with her foster parents and biological parents; and the CT Page 231 degree of contact maintained with her biological mother.[71] In reAlexander C., 60 Conn. App. 555, 559, 760 A.2d 532 (2000); In re Shyina B., 58 Conn. App. 159, 167, 752 A.2d 1139 (2000); In re Savanna M.,
supra, 55 Conn. App. 816. The court has further balanced Olivia's particular needs, and her intrinsic need for stability and permanency, against the benefits of maintaining a connection with her biological parent. See Pamela B. v. Ment, supra, 244 Conn. 314. Under such scrutiny, the clear and convincing evidence in this matter establishes that termination of parental rights would best serve Olivia's interests.
Despite her tremendous gains in physical development, Olivia remains a child with significant underlying special needs, as discussed in Parts I. C. and II. C. Olivia's medical conditions require regular assessment and surveillance through consultations and effective followup and communication with specialists in neurology, pulmonology and orthopedics. Olivia will need a firm, persistent and effective parental advocate to ensure that she receives appropriate support and educational services from the Board of Education serving the town where she resides. As Dr. Underhill credibly opined, the child will require continuing attention to her hyperactivity and propensity to act out under stress, and "in all likelihood will require therapy for . . . what will probably become behavior problems." (Testimony of Dr. Underhill.) Olivia's medical, educational and psychological needs cannot reasonably be addressed on a sporadic basis; they will require vigilant supervision and attention from a parent to ensure continuity of and quality of care for Olivia. Olivia's caregiver must have the ability to cooperate with service providers, to follow their instructions, and to implement their recommendations, all to ensure that the child has a safe and appropriate opportunity to maximize her own opportunities for healthy growth and development. The evidence clearly and convincingly indicates that Cherie B. is unable or unwilling to attend to Olivia's multiple needs on a regular, reliable basis now or in the future.
It is clear that Cherie B. loves her daughter.[72] In the past, she has sometimes shown herself to be able to meet Olivia's basic care needs when she is not required to face demands raised by her other children, Marvin or Daisy. Despite the vitriol she has directed at DCF, Cherie B.'s feelings for Olivia have been shown to be "touching and appropriate." (Exhibits 8a-8d, 13.) She has maintained adequate housing for Daisy and Marvin, and dresses those children well. When considering the issue of best interests, however, rudimentary parenting capacity, a mother's love, and a biological connection alone are "simply not enough" to warrant identification as an appropriate permanent caretaker for a child with Olivia's particular needs. In re Ashley S., supra. 61 Conn. App. 667. In this case, the evidence clearly and convincingly shows that Cherie B. CT Page 232 has not always remained committed to serving as her children's caretaker. On multiple occasions, while she has been represented by counsel. Cherie B. has advised DCF, in writing, that she did not wish to have contact with her daughter, voluntarily suspending visitation. In addition, in the summer of 2000, she advised DCF on several occasions that she no longer wished to care for her son Marvin, but that she wished him to be placed in a group home. (Exhibits C, F.) See Parts II. A. and II. B. Cherie B.'s inconsistent commitment to the reunification process. together with her inability or unwillingness to benefit from appropriate reunification services and her failure to achieve rehabilitation, all impel the determination that Olivia's best interests will not be served if she is returned to her biological mother's care. Furthermore, the overwhelming evidence reveals that while Olivia is now often comfortable in visits with Cherie B., she is firmly bonded with her foster mother, "whom she views as her mother."[73] (Testimony of Dr. Underhill) Judy V. has demonstrated her ability to consistently provide the safekeeping and supervision that Olivia requires, and has promoted the child's physical, educational and psychological well-being.[74] Under Judy V.'s care, Olivia has received the medical care and follow up required by her physical conditions and she has benefitted from the foster mother's advocacy insofar as school services are concerned. In the home of Judy and Robert V., Olivia's hyperactive behavior is managed through redirection and other consistent, predictable and appropriate parenting techniques. (Testimony of Judy V.) Judy V.'s skill and experience in cooperating with health-care providers permits the strong inference that she will acknowledge and obtain timely, effective professional attention for Olivia's psychological needs. Olivia's foster parents love her, and wish to adopt her so that she becomes a permanent part of their family.[75] (Testimony of Kelly W., Judy V.) In reVincent D., supra, 65 Conn. App. 666.
Moreover, the clear and convincing evidence establishes that if Olivia is removed from residence with her foster mother, the child will suffer serious adverse emotional consequences which the court cannot ignore in assessing her best interests.[76] (Testimony of Dr. Underhill.) Cherie B. has repeatedly attempted to depict Olivia's current placement as constituting a hospital like facility rather than a home. However, the evidence clearly and convincingly establishes that Judy and Robert V. maintain a congenial, supportive residence in which a social unit has been formed of people whose various developmental and medical needs are all being met while they live together; this is the home with which Olivia is familiar, and where she is comfortable, secure, and beloved, and surrounded by the company of those she now knows as her siblings and family. (Testimony of Kelly W., Judy V.) Balancing Olivia's intrinsic need for stability and permanency against the benefits of maintaining a CT Page 233 connection with Cherie B., the clear and convincing evidence in this case establishes that this child will best be served by allowing her to permanently reside in a stable, secure, and supportive environment with parents who are able and willing to oversee her overall condition, and effectively and consistently respond to her special medical, educational and psychological needs.[77] Pamela B. v. Ment, supra, 244 Conn. 313-314.
Our courts have recognized that "long-term stability is critical to a child's future health and development." In re Eden F., supra,250 Conn. 709. Furthermore, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." when resolving issues related to the permanent or temporary care of neglected children. In re Alexander V.,25 Conn. App. 741, 748, 596 A.2d 930 (1992); see also In re JuvenileAppeal (84-CD), 189 Conn. 276, 292, 455 A.2d 1313 (1983). The child's attorney, who also serves as her GAL. has argued that Olivia wishes to remain separated from her mother, so that she can be freed for adoption. Given the child's age and needs, the court has been urged to find that Olivia needs the permanency of placement and security that can only be brought about through termination of Cherie B.'s parental rights. The court is constrained to agree, and concludes that the clear and convincing evidence in this case establishes that the child at issue in this case is entitled to the benefit of ending, without further delay, the long period of uncertainty as to the availability of her biological mother as a caretaker, and the uncertainty of the issues raised through this litigation. Pamela B. v. Ment, supra, 244 Conn. 313-314.
Accordingly, with respect to the best interests of the child contemplated by § 17a- 112(j) (2), by clear and convincing evidence, and based upon all of the foregoing, the court finds that termination of the parental rights of Cherie B. is in the best interest of the child Olivia.
 IV. ORDER OF TERMINATION
WHEREFORE, after due consideration of Olivia's's sense of time, her need for a secure and permanent environment, the relationship she has with her foster parents, and the totality of circumstances; and having considered all the statutory criteria and having found by clear and convincing evidence that grounds exist for termination of parental rights; and having concluded that the termination of the parental rights at issue will be in the child's best interests, the court issues the following ORDERS:
That the parental rights of Cherie B. are hereby terminated as to the CT Page 234 child Olivia I.
That the Commissioner of the Department of Children and Families is hereby appointed the statutory parent for Olivia for the purpose of securing an adoptive family or other permanent placement for her.
That a permanency plan shall be submitted within 30 days of this judgment, and that such further reports shall be timely presented to the court, as required by law. That primary consideration for adoption of Olivia shall be offered to her current foster parents.
 BY THE COURT, ___________________ N. Rubinow, J.